# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 7, 2011

## STATE OF TENNESSEE v. LYNN GARY FRYER

**Direct Appeal from the Circuit Court for Madison County**
**No. 04-67      Roy B. Morgan, Jr., Judge**

---

**No. W2010-01686-CCA-R3-CD  - Filed February 3, 2012**

---

The appellant, Lynn Gary Fryer, pled guilty in the Madison County Circuit Court to aggravated assault, for which he was given a seven-year probationary sentence. Thereafter, the trial court revoked the appellant's probation and ordered him to serve his sentence in confinement. On appeal, the appellant challenges the trial court's revocation of his probation. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Lynn Gary Fryer, Tiptonville, Tennessee, pro se (on appeal), and Susan B. Korsnes, Jackson, Tennessee (at trial).

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee.

## OPINION

### I.  Factual Background

The record reflects that the appellant entered a best-interest guilty plea to one count of aggravated assault. He was sentenced as a standard, Range I offender to five years, with 120 days to be served in confinement and the remainder on probation. Thereafter, the appellant's probation was revoked but was reinstated after being extended two years.

Subsequently, a second probation violation warrant was filed against the appellant,

contending that he had violated his probation by committing unlawful acts, by failing to report the unlawful acts to his probation officer, and by engaging in intimidating and threatening behavior.

At the probation revocation hearing, the victim, Juanita Fryer, testified that she and the appellant had been divorced for ten years and had not lived together for more than four years. She stated that she lived in Jackson with her two adult daughters and her grandson.

The victim said that at around 7:00 a.m. on Saturday, April 10, 2010, she was at home with her daughters, her grandson, and her friend, Marcus Carter. The appellant came to her home and began ringing the doorbell repeatedly. She said that she knew it was the appellant because he had a "a certain distinct" way of ringing the doorbell. The victim did not answer the door because she thought the appellant would go away. She explained that she and Mr. Carter were in the bedroom, it was early in the morning, and she was not dressed. When no one answered the door, the appellant came into the house. The appellant hit the bedroom door with enough force to break the lock. He told Carter "to get the 'F' out of my house." The appellant told the victim, "Don't be having nobody at this house." The victim said that the front door and the bedroom door had been locked. After repeatedly yelling at the victim and Carter, the appellant left the house. The victim said that the appellant was "[l]oud, [and] boisterous" and that she was scared.

The victim said that she did not immediately call police because she was "in shock." She said that the appellant came to her house only to visit their grandchildren and that she had told him to always call first. She also asked that he not come to the house if he saw vehicles that he did not know. The victim said that Mr. Carter's car was outside her house.

An hour or two after the appellant left, the victim regained her composure and called police. She said that she did not "make a report" because the officer who responded to her residence told her that she had two options. The officer said that the victim could get an order of protection or she could "make a report and [the appellant] would go to jail at that moment." The victim stated that the appellant was employed and that she did not want him to lose his job; therefore, she chose to obtain an order of protection. The victim recalled that the appellant drove by her house while she was speaking with the officer. However, the appellant was not arrested for the incident.

The victim said that afterward, the appellant called her at work. He told her, "If anybody [is] there again, I'll do it again." After the incident, the victim called the appellant's probation officer.

The victim said that she and the appellant lived together "off and on until 2007." She

-2-

said that she received the house in their divorce settlement. However, the appellant refused to sign a quit-claim deed giving her sole ownership in the property. The victim presented a copy of the marital dissolution agreement (MDA), which provided that she was to be awarded the house. The victim said that the appellant was not supposed to have a key to her residence.

The victim said that she and the appellant had an agreement after the divorce that she would not have men at the house while her daughters were young. However, at the time of the incident the victim's daughters were twenty-two and twenty-five years old.

Ronnie Vandiver, the appellant's probation officer, testified that he filed a probation violation warrant, alleging that the appellant violated three rules of his probation. Vandiver maintained that the appellant violated rule one of his probation by failing to abide by the laws of Tennessee. He asserted that the appellant violated rule six by failing to "follow his probation officer's explicit instruction to immediately report any contact with law enforcement or any unlawful activity that might reflect upon [the appellant]." Vandiver stated that the appellant also violated rule thirteen by engaging in "intimidating or threatening behavior."

Vandiver stated that he learned about the incident from the victim. Vandiver stated that the appellant called him on April 12, 2010, the Monday morning following the incident, and scheduled an appointment for the next day because the appellant had missed a meeting. At the meeting, the appellant did not mention that he had gone to the victim's house; instead, the appellant "talked about . . . how well everything was going." Vandiver acknowledged that the appellant did not have any direct contact with law enforcement officers.

Vandiver stated that the appellant had signed a "behavioral contract" and that the appellant was instructed on the rules of probation. Vandiver said that he had explicitly instructed the appellant to "inform [Vandiver] of anything that might get [the appellant] in contact with police or might look bad on [the appellant] in some respect." Vandiver stated that he did so because the appellant "had a poor history of reporting things that seemed to be going wrong." When Vandiver was asked if "what might get [the appellant] into trouble" was too vague an instruction, Vandiver responded, "I think this is an easy one though, you break through someone's locked door when they're telling you to get out of the house and you're on probation for assault."

The appellant testified that he was married to the victim for approximately twenty-three years. He said that after they divorced in 2000, they continued to live together until 2007. After he moved out, his relationship with the victim was "okay," and he continued to go by her house or talk to her once or twice a week.

The appellant said that he and the victim had agreed that she would not allow other men to spend the night at the house when their daughters were there. He said that he intended for the agreement to be in effect regardless of his daughters' ages. The appellant maintained that the victim had violated the agreement on at least two occasions. The first time, he called the victim and reminded her of the agreement.

The appellant said that the night before this incident, he called the victim's cellular telephone three times, and she hung up on him each time. The following morning, he opened the front door with his key, which the victim had made for him.

The appellant said that when he knocked on the victim's bedroom door, she told him to get out of her house and that he could not tell her what to do. The appellant said that he "just took the knob and opened the door and pushed on in." The appellant said that he reminded the victim of their agreement and then left the house. The appellant denied threatening the victim; however, he acknowledged that he was angry.

The appellant said that he had no contact with law enforcement until he was arrested the following Friday. That day, he also learned that the victim had obtained an order of protection against him.

The appellant stated that on the morning of the incident, he was on his way to work. He said that he had seen an unknown car at the victim's residence previously. He said that he spoke with the victim about the car a week prior to the incident. The appellant stated that he did not know the car belonged to a man who was staying at the residence but that he "kinda assumed." He said that the victim "knew it was an agreement, and she knows how I am about my children, and she knew that was wrong."

The appellant said that the house still belonged to him because he had not signed a quit-claim deed. He said that he did not refuse to sign a deed but "it [had] never been brought up." When asked if he would sign a deed, the appellant responded, "Well I don't know. I'd have to – we'd have to renegotiate on that."

The appellant said that the victim called him after the incident to tell him that she had been refused entry to a club because of the incident. The victim did not mention the order of protection, and he was not aware of it until his arrest.

The court reviewed the MDA and found that it clearly required the appellant to quit-claim his interest to the victim. Taking this into consideration, the court found that the appellant violated rule number one of his probation agreement by entering the victim's house without permission and by his actions thereafter.

Additionally, the court found that the appellant failed to report the incident as required by the rules of his probation. The court, upon finding that the appellant had engaged in threatening and intimidating behavior, stated that the instant incident was clearly the type that should have been reported.

The court noted that the appellant had previously violated his probation by using drugs and had been given another opportunity to avoid incarceration. Therefore, given the nature of this violation, the court ordered the appellant to serve his sentence in confinement. On appeal, the appellant challenges the ruling of the trial court, arguing that the trial court erred in not recognizing that the agreement was enforceable and that the trial court "committed a serious misconduct by not upholding the law."

## II. Analysis

Initially, we note that the State contends that the appellant's notice of appeal was untimely filed. Rule 3(b) of the Tennessee Rules of Appellate Procedure provides that a criminal defendant may appeal to this court following "an order . . . revoking probation." Rule 4(a) of the Tennessee Rules of Appellate Procedure instructs that

> the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from; however, in all criminal cases the "notice of appeal" document is not jurisdictional and the filing of such document may be waived in the interest of justice.

The record reflects that the court's order revoking the appellant's probation was filed on May 10, 2010. However, the appellant's notice of appeal was not filed until August 9, 2010. Clearly, the appellant's notice of appeal was filed beyond the thirty-day time limit. However, this court may waive the timely filing. The appellant states that the delay was caused by his attorney's failure to contact him. In the interest of justice, we will address the appellant's issues.

Upon finding by a preponderance of the evidence that the appellant has violated the terms of his probation, a trial court is authorized to order an appellant to serve the balance of his original sentence in confinement. See Tenn. Code Ann. §§ 40-35-310 and -311(e); State v. Harkins, 811 S.W.2d 79, 82 (Tenn. 1991). In the alternative, "at the conclusion of a probation revocation hearing, the court shall have the authority to extend the defendant's period of probation supervision for any period not in excess of two (2) years." Tenn. Code Ann. § 40-35-308(c); see also State v. Hunter, 1 S.W.3d 643, 646 (Tenn. 1999). Furthermore,

probation revocation rests in the sound discretion of the trial court and will not be overturned by this court absent an abuse of that discretion. <u>State v. Leach</u>, 914 S.W.2d 104, 106 (Tenn. Crim. App. 1995). An abuse of discretion exists when "the record contains no substantial evidence to support the trial court's conclusion that a violation has occurred." <u>State v. Conner</u>, 919 S.W.2d 48, 50 (Tenn. Crim. App. 1995).

The appellant essentially argues that he and the victim had an oral agreement that she would not allow other men to spend the night at the residence while their children were home; therefore, he was entitled to enter the residence to enforce the agreement. The appellant maintains that, accordingly, he did nothing illegal and did not violate his probation. We disagree.

The trial court found that the appellant's unauthorized entry in the victim's house, his threatening behavior, and his failure to report the incident were violations of his probation. Upon revoking the appellant's probation, it was within the trial court's authority to order the appellant to serve his sentence in confinement. <u>See</u> Tenn. Code Ann. §§ 40-35-310 and -311(e); <u>State v. Mitchell</u>, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991). The trial court did not abuse its discretion by finding that the appellant violated the terms of his probation.

### III. Conclusion

In sum, we conclude that the trial court did not abuse its discretion by revoking the appellant's probation. Therefore, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE